al. Thank you and may it please the Court. This case concerns a trustee's effort to recover millions of dollars that are the undisputed proceeds of a massive Ponzi scheme targeting elderly retirees. As this Court has held repeatedly, once circumstances put a party on inquiry notice, the failure to inquire is inconsistent with good faith. When it comes to those circumstances, CIANA is able to explain a lot in its brief. But it does not explain, and indeed curiously never really attempts to explain, why any legitimate investor would use a double-flip, double-bump process to acquire mineral interests. Why would any legitimate investor in a simultaneous set of transactions double purchase prices? The Provident transactions were one of multiple Ponzi schemes around the country run by Joe Blimline, a convicted felon, and they were fairly simple in their operation. I think it's worth taking 90 seconds at the outset this morning for me just to describe one of those transactions to the Court, the one in a little more detail than we did in the brief. The one we cited in the brief was a purchase from a pair of landowners in Oklahoma named Joe and Wanda Faye Myers. CIANA entered into a contract with the Myers to pay $64,000 to acquire mineral interests on 80 acres of land. That was Provident's set $800 an acre price. But the deed showed a purchase price of $104,000. So right out of the chute, there's a $40,000 difference between the actual purchase price and what the public records showed the purchase price to be. CIANA then flipped the property to Ruthven for $91,000, a $27,000 profit that is shielded from public view by the wrongful claim of a Dock Stamp exemption. They claimed to be affiliated entities and that they were exempt from the Dock Stamp, so no one can see that. Ruthven then flips the property to Provident for $126,000, again a $35,000 profit in the case shielded from public view. So in simultaneous transactions, this property goes from $64,000 to $126,000. Provident then, and this is the part I think that's important that's not really in the brief, is to work the money backwards. Provident would wire $126,000 to Ruthven. That's Provident's purchase price from Ruthven. Ruthven then wires $104,000, the deed price, to CIANA. In doing so, Ruthven pockets $22,000 on what originally was a $64,000 purchase. CIANA pays the owners their $64,000. CIANA pockets $40,000 on what originally was a $64,000 purchase. So what's the end result when the dust settles? Well, number one, the people downstream from Blimline, like CIANA and Ruthven, are able to pocket these fairly substantial amounts of money without anyone seeing it, without anyone being able to detect it. Then, Blimline gets his money because he's now got on Provident's book a mineral interest that he paid $126,000 for, and he lures victims to the scheme by showing them this valuable property that he's acquired. It's worth $126,000. According to one of the exhibits at trial, Blimline's also getting kickbacks from Ruthven throughout this process. More importantly, from the SEC receivers... Were you getting anything from CIANA also at the time? You used the word kickback. There is no evidence in this record of kickbacks from CIANA to Provident. And my other question is, the transaction you just described, is that the same scheme as you describe it for all of the transactions that you wanted to present at trial? It is essentially all 197 acquisitions. They don't deviate in terms of any intent. Maybe the dollar amounts and certainly the properties are different, but they don't deviate in any...there's no significant difference in terms of what the jury's appreciation of the transactions are. None whatsoever. In fact, the only distinction I can think of, meaningful or otherwise, other than amount, would be that in some transactions in Kiowa County, the flip from Ruthven to Provident is the dock stamp is paid on some of those deeds. Okay. The reason I'm asking, obviously, is because one of the issues I believe that is briefed appeal is that the district judge did not include on the verdict form a space to answer for every single one of the transactions at issue. What would be the benefit of having the jury undergo that exercise? So the distinction and the reason that mattered had nothing to do with the structure of the transactions and everything to do with CIANA's growing knowledge of the structure of the transactions. In other words, for example, the ball letter is probably the easiest example, although there are others. So one of the issues in this trial, and I sort of had intended to get to that jury issue last, but this is probably a good time to address it. One of the issues that everybody knew about in this trial was that the jury might well conclude CIANA was in good faith day one to day end, or the jury might well conclude CIANA was not in good faith day one to day end, or, and CIANA knew this as well, the jury might conclude that CIANA began in good faith, but as things progressed, they knew enough to ask questions. And it's interesting because this is not something that's in the briefs, but I think it's very important. If you look at the joint pretrial order in this case, this is CIANA's dispute. The fact issue CIANA submits to the trial judge in the pretrial order says whether CIANA took such funds in good faith and, if not, the date on which CIANA no longer acted in good faith. So everybody in this case knew it was possible there might come a date. That was the reason that they had to be charged transfer by transfer because otherwise there was no way for the jury to make that conclusion. It was just all or nothing. So what do you consider to have been the order of proof to offer in support of that proposition, to answer that question favorably to your client? Were you, did you believe that it was appropriate to introduce evidence for each and every transaction, or was there a timeline where you prearranged, I'm going to do the following eight transactions, and here are the dates on all of them, and my argument is that certainly by the third one or the fourth one, the gig is up. He should know that things are not on the up and up. So that argument was made to the judge but not to the jury, if I understand your question correctly. It wasn't made all along, though. Did you tell the court in the pretrial order and then in the opening, did you say, hey, it's really important that I be able to have some leeway here because I need to, did you explain, was this not you? Was this explained to the court at reasonable stages, and which stages was it explained to the court? I don't know that it was explained in that detail. I don't know what reasonable stages. It certainly, in the charge conference, was discussed at length. And I think to your question, Your Honor, it's very important to understand the trial judge, the answer, I think if I understand your question, you're saying did you ever essentially propose a charge that grouped transactions. And the answer to that is no. For example, we did not ask for a question that was pre-ball and post-ball. And there were a couple of reasons for that. The first is that it would have required, I think, the trial court to comment on the weight of the evidence. I mean, for the trial court to ask a question specific to red flags would sort of have been an endorsement by the trial court that those were red flags. I'm not sure we could have asked for that. But you did. Why wouldn't you ask for that and let the court tell you they can't get it? Well, and that's where I was going with my second point. The judge was very clear. She stated on the record. She wasn't going to allow any question other than one. She very clearly says on the record, because there was some discussion about do we really want to give the jury 197 questions, and the judge said I'm not making this decision on that basis. I don't find that the charge would be unduly burdensome. I'm making this decision because I think all the facts of all the transactions are the same. That's what she said on the record. Well, how many – when we talk about the facts regarding the transactions, how many transactions were presented in detail with witness testimony as needed to the jury? If we had, let's say, 100 – what was the number? A hundred and ninety – if we had 197 transactions, certainly at some time prior to trial a decision was made that we're not going to show 197 because we'll be here for eight months. So what we're going to do is we're going to show four, or we're going to show three, and then we're going to argue to the jury that, you know what, not only did they do it in those three, but they did it in the other 194 as well. So I'm trying to understand your – I'm trying to understand why the district judge would have said no, I don't want to include any more questions other than one. What was the explanation and what was the unfolding of the evidence at trial that caused that to be the wrong decision? And so the response, and this absolutely was argued to the district court judge, was our belief showed a growing number of cumulative red flags over time. And the two most obvious – well, actually that's only part of the equation. But I'm – not to interrupt you. I'm asking about specifically what was the evidence that was presented to the jury for the judge to say, oh, I see, you're showing them an earlier transaction, a mid-term transaction, and then ones towards the end. Now I understand what the jury has seen, and now I see the wisdom of including more than one question on the verdict form or giving a charge. At some point you're claiming she made an error for not doing that. The explanation to the trial judge was Exhibit 93 charted every transaction at issue, every single one, and we were going to stand up in closing argument and to oversimplify a little bit, say this is the date of the ball letter. You, jury, need to go back in the jury room with Exhibit 93. You need to circle the date of the ball letter. And every transaction that came after that letter, at a minimum, at a minimum, every transaction after that letter you have to find was not in good faith. And that was the argument we made to the trial judge, was that the jury needs the capability to do that, because that was $13 million after the ball letter. Why couldn't you do that still? I'm sorry? Why couldn't you do that still? You don't have to put on the evidence of those transactions in order to say that. Well, except that— You can't just say here's the letter, and we know that there's 197 of them, and 52 of them totaling X amount were after this ball letter, which any reasonable person would say would show you can't be in good faith. I mean, that's your argument. I'm not agreeing with it. Why can't you do that without the transactions? Well, because there was only one question. Was Siana in good faith? I mean, there was no way for the jury— And maybe there's a different way of saying this. Maybe I'm—I can't say. I don't understand why— As I stand here— You could have gotten a time period. We could not. I mean, that's— No, I don't see that you submitted one and that you got it denied. I don't see the process that you go through when you're trying to get something in the charge that you think is worth so many millions of dollars, that you would submit it in a proposed form, you would argue, you'd make your offer approved. You would do a whole series of song and dance at the charge conference. It was not done here. Well, candidly, I disagree with you, Your Honor. We feel we did, and here's why we feel that way. There were a bunch of red—I mean, I'm citing the most obvious, but there were like a dozen, in our view, red flags, and there would have been no way to submit that charge other than transaction by transaction. There just wasn't any way to group them, and certainly wasn't any way to group them without sort of inherently commenting on, you know, if you had cited particular dates or red flags, then you were sort of highlighting those red flags to the jury. I mean, that, I think, would have been inarguably prejudicial to Sianna. I mean, the only—our charge, in our view, and maybe this is the simpler way to answer the question, which I really am trying to answer, our charge was proper. I mean, transfer by transfer might have been more cumbersome, but it was proper. And the way it went to the jury was not proper because the central question in the case, which is when did Sianna stop acting in good faith, to this day, as I stand before you, I have no idea what the jury's opinion on that was because they never got asked. But did you submit that as a particular question? What were the ones that you offered that you got denied? I thought you just got denied transfer by transfer. That is the one we offered. Did you submit one that says on what date do you find the thing was no longer in good faith? Did you submit that question? Do you find that they were continuously in good faith throughout the entire time period? If not, then on what date did you find that they ceased? Do you know what I'm saying? I do and we did not. You didn't do any of those. No. In our view, that was exactly what the transfer by. And again, that question was proper. And the trial judge never once stated a belief that it was too cumbersome. Because practically, think about this for a minute. I assume that's where everyone is coming from, this idea of the jury having to answer 197 questions. But practically speaking, that wasn't going to add much to the endeavor because the jury was either going to go all this way, all that way, or pick a date and every transaction afterward was a no. So, as a practical matter, as a trial lawyer or a trial judge, you were probably adding 45 minutes to the jury's deliberations by giving them 197 questions as opposed to one. Yeah, but I tell you, there's not any way you're going to sell that judge on 197 transactions questions. Well, we certainly didn't do that, Your Honor. It wasn't going to happen. That's just realities, Bill. And there's, I can think of five off the top of my head different ways you could get to the point by asking succinct one or two questions. Five different ways just off the top of my head. And so, I don't, there would be two questions each that would get to the same point. We certainly could have asked the date question. That's the one that I would concede we could have asked it that way.  The code says each transfer, and we thought transfer by transfer was a proper question. And again, to me, it's a little bit of an academic discussion in the sense that the trial judge was real clear in saying on the record, I'm doing this because I don't think there's any basis to differentiate at all among any of them. She said those words on the record. I think you're in a difficult spot because this was your fourth issue, and we've taken all of your time on it. So each side can have two more minutes, and you can go back to whatever you wanted to talk about today. I appreciate that very much, Your Honor. That is what happened. Let me just very briefly, I'm going to spend one minute on red flags and one minute on good faith. The red flags, the In re Harbor case is the one we would like the court to focus on. That's a Fourth Circuit case that involves a very strangely structured set of transfers where they're paying the money. A company is paying a third party, but they're running it through the owner's mother. They pay the mom, and mom pays the third party. And the Fourth Circuit looks at that and says, there is no legitimate business explanation. Even if the transfers themselves were kosher, there's no legitimate business reason to structure them in this bizarre way. And so we think the mom, when she gets to trial and says, I don't know why, and I never ask questions, we think she was aggressively ignoring red flags. That, to us, is the situation we have here. Why would anyone use a double flip, double bump to acquire property? It just doesn't make sense. Okay? The other thing I would mention about that, Sianna's only real response to that is to point to these earlier MAP transactions. Well, this is just like what we did for this company called MAP. And actually, all the evidence is to the contrary. Number one, there was no double flip in MAP. Sianna got the properties, gave them to MAP. There was no double bump in the prices. Sianna knew all about MAP's company, the principles, their investment goals, their strategies, what they were trying to accomplish. And most important, MAP expected Sianna to negotiate the best prices it could get, like anyone would. Okay? So totally different from these transactions. So that's our good faith argument, where we believe the great weight, there should be a new trial. With respect to good faith, we believe the Court should render on the good faith issue, and very similar to what this Court did in Philadelphia gear, in a different context looking at Louisiana State law. We don't think that the Court needs to draw any broad rules or enunciate any grand principles. We think the Court can look at this and say, in the context of these transactions, the dock stamp is what enabled the Ponzi scheme to operate. It's what shielded it from discovery, and in this narrow circumstance, we believe it negates good faith as a matter of law. The good faith is a matter of law. You think the evidence is such that you should have gotten judgment notwithstanding the verdict on good faith as a matter of law. What do you think went wrong at the trial? If you think the evidence is so clear that it was required to be as a matter of law, then how did it not get there? That's probably an answer I cannot give in less than five minutes, Your Honor. Because you're a very experienced lawyer. I think part of it had to do with the jury charge. Whoever's responsibility or culpability that was for the charge going the way it went to the jury, I have thought since I became involved in the case that there's a very reasonable possibility this jury may not have thought Sianna acted in good faith on all of these transactions but was sort of left with an all-or-nothing question. I think the other thing that happened on good faith in particular was there was all sorts of testimony about whether people routinely violated that dock stamp. And I'm not sure the SEC receiver ever really explained to the jury in a way they understood why it was so essential to concealing the scheme, which it is. I understood his testimony when I read it, but I could also understand why a jury might not have understood his testimony. It's very much like that arbitration clause that Judge Higginbotham was talking about in Janvey where this was really important. Just airing the scheme to the public one time in a lawsuit in Janvey could have caused it to be uncovered. The same thing was true with the dock stamp, and the best evidence of that is it got aired one time. William Ball just happened to know his price one time, and he saw land fraud. I mean, just right away, immediately. And so in our view, I think that's part of it, though, is that the jury may just not have understood the central role the dock stamp played in concealing the scheme. Thank you, counsel. Thank you. Please report. Matt Brockman on behalf of appellee defendant below, Siena Resources, Inc. I want to begin by addressing the court's concern about the jury charge and the transfer-by-transfer issue and some of the questions that were raised. The reason for why the judge determined that the evidence wasn't put on in a way that would allow the jury to differentiate between early transfers and mid-transfers and late transfers was because the evidence wasn't put on that way. The judge made that comment on the record during the charge conference after the evidence had come in, after four separate pretrial conferences, after five days of trial, hearing all of the cross-examinations of Siena's witnesses, hearing all of the examinations of the trustee's witnesses. That's when the judge made that comment. And the reason that the trustee presented its case in that manner was because it made great efforts throughout this trial to avoid a compromised verdict. The trustee's counsel had expressed some concern early on during the pretrial conferences that Siena would try to revisit the mere conduit issue by trying to sneak in the back door with the jury and try to get a compromised verdict from the jury and have the jury determine that with respect to the amounts that went through Siena all the way to the mineral owners, Siena acted in good faith. We're only going to look at the commission component. The trustee made great efforts to ensure that that compromised verdict would not occur. There were many conversations about it, and many, many times the judge stated on the record that she was not going to allow any possible evidence or argument from either side that would allow that type of compromised verdict. It was only after the trustee lost entirely that it began making this new argument that its intent all along was to try to, in its deathly prepared closing argument, come in and say, well, even if you don't think that Siena acted in bad faith from the beginning, certainly at some point in time they were no longer acting in good faith. That's not a part of a compromised verdict. That's a theory of the case that over time you acquire more information and you should be on notice. That's a legitimate theory of the case. I agree, Your Honor, and had that been the legitimate theory of the case from the outset and had that been how the evidence was presented to the jury, then the district court may have made a different conclusion and the jury charge may have been fashioned in a different way. But they have a right to argue that to the jury. Absolutely. Absolutely. So were they — why weren't they deprived of arguing that? They were not deprived of arguing that. The suggestion that they modified their closing argument at the tenth hour because the judge is ruling on the jury charge is just — it's not supported by the record. They easily could have gotten up in closing argument and made the very argument that they're making in this appeal, which is that at the time of the ball letter or at the time the subbroker agreement was signed or at the time of any other event that happened throughout these series of transactions, at that point, Sienna no longer acted in good faith. They could have made that argument. Absolutely. They could have made that argument in opening. They could have — Did they just not mention it in opening? I haven't — I can't remember the opening. No, Your Honor. If you review the opening statement, it's very clear that the position the trustee was taking was that all of these alleged red flags showed that all of the transactions in their entirety were fraudulent or were not performed in good faith. But it's not a compromise. The court did not say that she would not allow a compromise verdict, being that some would be and some would not be, right? That's not what the court said. That's not compromise. That's a different time period. Well, the court — I think the exact words the court used several times when these issues came up, both from the idea that Sienna might seek a compromise verdict and this theory of the case issue. Compromise — I don't understand what that means in this context. Perhaps that's my own inartful word. What I'm intending to convey is a judgment in the trustee's favor, but for some amount less than the full amount of the transfers. Why isn't that totally legitimate? It would be legitimate, but the district court was concerned about the mere conduit issue. There's two issues here. One was from Sienna's perspective and the trustee's argument that Sienna was going to attempt to get a reduced verdict based on the mere conduit argument. A second issue after the verdict was rendered that's now been raised in this appeal is this argument that the trustee wanted to suggest that the time period would allow some differentiation. The issue there is that's not how the evidence was presented. That's not how the theory of the case was presented. If you go back to the opening statement, you'll see the arguments were always that these red flags applied to all 197 transactions. So nowhere, even in the closing argument, your opponent did not ever suggest to the jury that, well, you may find that even if you find he started out in good faith or without any suspicion, at some point his antenna should have gone up and this is too good to be true. Is that argument was never made in closing argument at all? Not the way I understood the argument was made based on the appellate. It was all or nothing from the get-go, pre-trial conference all the way through to the closing argument and the jury charge is how the case played out. Is that correct? Yes. Yes, Your Honor. And it was not ever thwarted by the district court in these three times when the district court discussed this? You said you were going to tell us about three times the district court was discussing. What did the district court say she would or would not allow? I'm not sure what you're requesting about the three times. What I was referring to were there were two different issues that led to many discussions throughout the pre-trial conference and during the trial about the trustee's concern that Sienna was going to ask the court or ask the jury, excuse me, in closing to reduce the amount of any judgment based on the fact that with respect to the funds that were paid to the mineral owner, Sienna acted in good faith or with respect to, you know, the taxes that it paid or some other argument. We never attempted to make that argument or present evidence about a reduced verdict, but the trustee was concerned about it and the judge addressed that and said, no, this is an all or nothing thing. Either the transfers are going to be recovered by the trustee in their entirety or they're not. But with respect to the second issue, the timeliness issue, when the judge was addressing the jury charge, the reason that the judge determined that an all or nothing conclusion was required there was because the evidence as it was presented to the jury was not on a transaction-by-transaction basis. The judge, first of all, the judge did not say I don't think that the jury charge you're proposing, which has 591 special interrogatories, is not burdensome. She didn't say that. She said that's not the basis of her ruling. The basis of her ruling was that at this late hour, based on the evidence as I have heard it, as the judge has heard it coming in, it would be very confusing to the jury now to suggest that they can differentiate between transaction A and B and C because you haven't done that throughout the trial. I'm sorry? Post-ball letter, pre-ball letter. Why couldn't they do that? They could have done that in the closing argument. There was no limiting issue. Why couldn't they do that in the charge? Why couldn't it be post-ball letter, pre-ball letter, or just a question on did their good faith change as a result of the ball letter? It doesn't even have the transaction-by-transaction. It could have been done that way. The trustees' counsel didn't ask for it to be done that way. I'll note as well that we had proposed during the charge conference when this issue was raised, other alternatives, including a fourth question. After going through the three elements, a fourth question, which is if you find no to any of these elements, identify the amount of the transactions for which Sienna did or did not act in good faith. And, again, the reason that the trustee was so adamant on its form of the proposed jury charge with the 30 pages and 591 questions as opposed to some more simple way of getting there was because they weren't looking for a decision where there's a differentiation between early and late. That really wasn't their intent. That's what they're saying their intent was now. But the intent really was to attempt to confuse the jury and to have all of these transactions listed out and make it look like this number was just so huge and went on for so long. That's what they were really trying to do. That's relevant, though. But the fact that it's a huge number of transactions and went on a long period of time gives rise to the idea that they should get a clue at some point. That's very relevant to the good faith of your client. So that's not confusing. That's helpful to their side. Well, and that evidence was in. That evidence was before the jury. There was nothing that precluded them from making that argument. Absolutely nothing precluded them from making that argument. Okay. Opposing counsel cites this ball letter of evidence that at that point there could be no good faith. Why isn't that true as a matter of law? Absolutely. A question was asked to opposing counsel as well. Was there any difference in the structure of these transactions? And he conceded that no, there was not. But events occurred that made Sienna be more knowledgeable about the events. Well, the ball letter, all it does is identify the structure of the transactions. It identifies the fact that Sienna was retaining a commission and that the amount that Provident was paying was more than the amount that the mineral owners were receiving. That is the structure of the transaction. And that the amount in the records is wrong. The county records are being false. Yes, Your Honor. Once your client knows the county records are false, how can they be in good faith? Well, the question of good faith is determined by whether or not Sienna knew or was on inquiry notice of the fraudulent intent of the transaction. So there has to be some connection between the document stamps and how the deeds were recorded and some fraud in the transaction. That's what the good faith element goes to, knowledge of fraudulent intent behind the transactions. The fraudulent intent behind these transactions, the reason that the transfers were avoided was because Provident was run as a Ponzi scheme. That was the fraud that led to this avoidance action. And the fact that the documentary stamps were recorded as they were has absolutely no connection with the Provident Ponzi scheme. There's nothing about that fact that would cause Sienna to know or be on inquiry notice of how Provident is raising money from its investors, what it's telling its investors, and whether or not it's using new investor funds to repay older investors. It wouldn't tell an ordinary person that there's something sketchy going on here if the documents that are filed in the county are false? In this case, the evidence was that the documents were filed in the county exactly the way that Sienna has always filed documents in the county. So there's always a price discrepancy that they know about? Sienna's practice, well before it ever was hired by Provident, well before any of these transfers, was to file deeds within the counties that included both the amount paid to the mineral owners and its commission. And it wasn't just Mr. Schutt's testimony about that. Mr. Barnhill, an expert testimony, an expert witness that testified on Sienna's behalf, also testified that other brokers, other landmen, commonly used that practice. And the reason is because if you file it with the exact amount that was paid to the mineral owner without the commission, then there's information given to other competitor brokers and landmen who can go in and— So they're filed with totally made-up false amounts? No, Your Honor. The way he actually calculated it was the amount that went to the mineral owner plus his commission. It wasn't just an arbitrary amount. That was what he reported. But again, the question is his state of mind. There was nothing about the way these deeds were recorded in these transfers that was different from the way Sienna had been recording deeds for 25 years. So this amount is exactly the commission plus the real price every single time. It's not some intermediary amounts and this and that and the other. That's correct. Across the 197 transactions, I think there was one or two that were off by $50 or so on a per-acre basis. But the vast majority, 99 percent of them, were the amount that was paid to the mineral owner plus Sienna's commission. And this is the custom in the industry to post a wrong amount in the document, in the county documents? Yes, that was the evidence. Mr. Shutt testified that was his past practice for 25 years as a broker. And Mr. Barnhill testified that Mr. Shutt is not the only one that does that, that other brokers and landmen do the same thing. And with that in mind, again, the question is Mr. Shutt's state of mind. And if there's nothing about the way these deeds were recorded that would cause him to believe these transfers were unique somehow, then there's no reason to conclude that he knew there was some fraudulent intent behind the transactions. If you didn't know that, but you would assume that there's something weird going on. If somebody gave you something and you knew it was a different amount and you were going to go record it, you would be wary of that. Well, it was Mr. Shutt's decision on how to report it. It wasn't that he was given information from Providence or from Ruth about how to go record this. It was his decision on how to record it. Another important issue here is, one, there's nothing unique about these transfers from Sienna's prior practice or the practice of other brokers. But more importantly, there's a missing element to connect it to any fraud. The question is, well, wouldn't you know that there was some wrongdoing there? There is no wrongdoing because what the trustee is trying to imply is that the reason that these were reported incorrectly was that we could hide certain amounts, certain components of this transaction so that we could kick money back up to Blimline or to Holland or to some other bad actor. That is just not what happened. The trustee's own witness testified. The SEC receiver, Mr. Lucene, testified. There is no evidence of that. There were no kickbacks. There were no, you know, siphoning off of funds. That's not what happened. So there was no fraud in connection with the transactions. There's no reason for Sienna to believe that the fact that it retained a commission, agreed to by its client, was evidence of some type of fraud. There's just no connection between the two. Let me ask you about something that your opponent maybe didn't have time to raise but wasn't covered on the initial oral argument. With regard to the request for admissions, is there any dispute? I know it was not disputed with a response, but was there any dispute even as we sit here today with those matters that were requested to be admitted? No, Your Honor. Was that just rudimentary information about each transaction that happened on this day and the document reflects this number and that type of information? Yes, Your Honor. Opposing counsel referred to this trial exhibit that was a master chart of all of the transactions that identified the dates the deeds were filed, the amounts that were paid, the amounts of commission that were retained, et cetera, et cetera. Those rudimentary basic facts about the 197 transactions. So the chart was actually used at trial and shown to the jury as a demonstrative exhibit or as an admitted exhibit? As an admitted exhibit. Okay. And the information on the chart, is it your position that the information on the chart was distilled entirely or at least in large part from the request for admissions that had been sent and not been responded to during the pendency of the litigation? Yes, Your Honor. And one of the issues that came up when the motion for protective order was filed was there were two options of ways to go about this, either answer the request for admissions and stipulate to the basic facts. At the time, no stipulation was entered into, but the chart came in as a pre-admitted exhibit without objection. And the underlying documents that were used both for the request for admission and for the chart, you know, six or seven large notebooks, and using the chart allowed the trial to move more expeditiously without having to go through each of the documents and each of the transactions. That's what the request for admission were for. That's what the trustee's counsel said they were for. And that's how the basic facts were used. And we have no dispute with that issue. Did the chart go back? I'm sorry? Did the chart go back to the jury? Yes, Your Honor. It was an admitted exhibit that went back to the jury. It was admitted and went back to the jury, the demonstrative chart. No, it wasn't a demonstrative. It was an actual trial exhibit. Summary. Summary of voluminous evidence or whatever, right? Yes. And the evidence itself went back as well. But the chart went back as an independent individual trial exhibit. See, I still have some additional time because of the two minutes that was provided. But unless you have any further questions, I think I'll rely on the briefing. Thank you, counsel. We have your argument. May it please the Court, I think I'd like to spend most of this time talking about the red flags in good faith since I spent most of my initial time on the jury charge. Very briefly, the big picture on the red flags, it's important to note I have not attempted to argue any of the things that Cianna explains in its brief today. I am focusing on the one thing Cianna never explains, which is the double flip, double bump. Why would anyone ever use a double flip, double bump? Counsel today for the first time has said, well, that was the same as every transaction Cianna had ever done. There is zero evidence in the record to support that statement, literally none. Shutt never testified about a single other transaction in his entire career that involved a double flip and a double bump. He talked about other aspects of the transactions that were similar, but not that one. And why is that important? Because it is our view that you can toss all of the ten other red flags out the rear window and the double flip, double bump on its face was sufficient at least for him to be asking questions. Why would anyone do it this way? Now you stack on top of that the Ball letter, and I think counsel is forgetting one really important sentence in the Ball letter. Ball identified the double bump. Cianna admitted at trial knowing about the double flip, but they hedged a little bit on whether they knew about the double bump. They had said in their interrogatories they did, then at trial they said they didn't. Well, Ball told him about the double bump. He said, hey, either way, it's not just the discrepancies in the dock stamp on your sale to Ruthven. I went and pulled Ruthven's deed to Providence because I wanted to see what happened to my property, and guess what? Ruthven flipped it on to Providence for an even bigger profit. So now once they had the Ball letter, they knew not only had it been double flipped, but it had been double bumped. You know, anyone who was around back in the late 80s in Texas and Oklahoma in the S&L crisis has seen this before, and Ball had too. We used to call this a daisy chain when you are flipping and bumping and flipping and bumping, and anyone like Kyle Schutt, an oil and gas lifer, at least would have known enough to pick up the phone and say, hey, there may be a perfectly logical explanation for this, but why are we doing it this way? I don't understand why we're double flipping it and double bumping it. So that's red flags. With respect to good faith, the argument now, and I think this is really what it boiled down to to go back to your question, Your Honor, was everybody does it. Everybody does it. Except that's not really what the testimony was. If the court will go back and look at the expert's testimony, Barnhill, what Barnhill said was he had heard of other people doing it. That's what he actually said. And then he used the word, he said it recurs. I don't know what that means, but there was no testimony in the record that this was the industry norm or the industry standard or that it was objectively reasonable or everything, nothing like that. Yeah, Sianna's not the only person ever to do this. I've heard of other people doing it. It recurs in our industry. Our view is that good faith in almost any context in the law requires two things, subjective honesty and objective reasonability. Schutt admitted he was dishonest on the dock stamp. I mean, he flat out, I mean, he was asked, so you lied on the dock stamp, and he said yes. He was asked at another point, so you broke the law on the dock stamp. He said true. He admitted he was being dishonest. He just said, well, I was just trying to mislead all the competitors. That is not honesty. It is dishonesty. More importantly, the fact that everyone does something illegal does not make that an objectively reasonable business practice. You know, it was not objectively reasonable for savings and loans to be flipping properties with ever-inflated fraudulent appraisals even though, as we ultimately found out, almost all of them were doing it. Those were not objectively reasonable business practices no matter how many SNLs were doing it. And the same thing is true here. It was critical to the scheme, as the SEC receiver testified. And the easiest way to say that is we were preparing for oral argument. The SEC receiver said something to me that really made this sort of clear. He said, you know, imagine if Providence Investment Materials had said this, hey, potential investor, we're going to take your money and we're going to bump it twice so that your $126,000 ends up buying only $64,000 of mineral interests. Would anyone in the world have ever put a penny into Providence? And the answer is no, of course not. What did the Dock Stamp do? It prevented anyone from knowing that what I have just described was the actual way Providence did business. It was central. To use Judge Higginbotham's words, it took the Dock Stamp fraud to the heart of the criminal enterprise in this case and enabled $485 million in Ponzi scheme. Thank you. This concludes the arguments for today. The court will stand in recess until tomorrow morning at 9 a.m. Thank you. Thank you.